## LIDA M. MEYER v. THE FIDELITY AND CASUALTY COMPANY OF NEW YORK, Appellant.

**Accident Insurance:** CONSTRUCTION OF POLICY. A policy excepted injuries caused by "disease" and "bodily infirmity." The court charged that these words as used in the policy, mean, practically, the same thing, refer to some ailment or disorder of a somewhat established and settled character, some physical disturbance to which the insured was subject, and of which an attack causing him to fall was, in some measure, a recurrence, and have no reference to some temporary disorder which is new and unusual and arises from some sudden and unexpected derangement of the system which produced unconsciousness. *Held,* the instruction is correct and does not charge that "disease" as used in the policy can not be established except by proving that the attack was a recurrence of some previous attack indicating disorder.

NOTE.—The authorities on what constitutes "accident" within the meaning of an accident insurance policy are collated in note to *Fidelity Co. v. Johnson* (Miss.) 30 L. R. A. 206.

SAME. Injuries caused by a fall due to a temporary and unexpected physical disorder are "violent" "external" and "accidental" within the meaning of those words as used in an insurance policy.

Evidence that insured staggered before he fell is not conclusive that he had "fits or vertigo," when he had been in good health so far as known, and the physicians testified that the staggering might have been due to other causes.

*Appeal from Scott District Court.*—HON. C. M. WATERMAN, Judge.

FRIDAY, DECEMBER 13, 1895.

Action at law upon a policy of accident insurance. Verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*T. A. Murphy* and *Davison & Lane* for appellant.

*Cook & Dodge* and *Julius Lischer* for appellee.

Deemer, J.—On the twenty-fourth day of December, 1891, the defendant issued a policy of accident insurance, for the sum of five thousand dollars, to one Herman H. Meyer, insuring him against accidental injury occurring within one year from that date, and agreeing to pay his wife, the plaintiff herein, in the event of the death of the assured through external, violent and accidental means, the amount of the policy. The policy also provided that the insurance should not cover "injuries, fatal or otherwise,  *  *  *  resulting directly or indirectly from intoxicants, anæsthetics, narcotics, sunstroke, freezing, vertigo, sleepwalking, fits, hernia, or any disease or bodily infirmity." The insured was a designer of machinery, and at the time of his death was the superintendent of the Davenport Foundry & Machine Company. Prior to his death, he was a man of good health, temperate in his habits, and industrious in his work. On the

twenty-first day of October, 1892, he left his home in apparent good health and spirits, to go to the city of Quincy, in the state of Illinois. Arriving at Quincy at 10 or 11 o'clock in the evening of that day, he went to the home of a brother who resided in that city, and passed the night with him. About 8 o'clock next morning, he left his brother's house, and went down into the city to a bank where his brother was engaged in business. Here he remained for about twenty minutes, when he left the bank, in quest of a certain tobacco factory. He was next seen about a block from the bank, by a lady who, with a companion, with whom she was busily engaged in conversation, was coming up the street towards the place where the assured was standing, or, more properly speaking, staggering, as a witness puts it. The attention of this lady was directed to Meyer by his conduct. She says that, when she first observed him, he was standing close to an electric light pole, with his right arm raised and extended toward and about the pole, as if to gain a hold upon it; that he seemed to be making a continual effort to embrace or grasp the pole. His left hand was raised to about the height of his shoulder, as if to raise it to his head. During this time the assured's body had a wavering or staggering motion. The witness did not keep her eyes upon Meyer, but walked some distance after she discovered him, and turned to go into a store which was nearly in front of where he was standing. Just as she turned to enter the store, she heard a thud or sound from behind, which again arrested her attention; and, upon looking around she discovered Meyer lying upon his back, or nearly so, on the brick pavement, almost immediately in front of where he stood when she first saw him. Another witness saw Meyer just as he was falling, and saw his head strike the pavement. A third saw him, just as he was stepping off the edge of the flagging,

stagger and fall. This witness does not remember of having noticed him before. He says he does not know and could not tell whether he tripped on the edge of the flagging, or simply staggered and fell. The fall resulted in the fracture of Meyer's skull, from the effects of which he died in a few hours. The defendant refusing to pay the amount of the policy, plaintiff thereupon commenced this action, alleging the issuance of the policy, the death of the assured, and a compliance with all the conditions precedent on her part to a right of recovery. The defendant, in answer, admitted the issuance of the policy, and the death of Meyer resulting from injuries received through a fall, but denies that Meyer died from the direct effects of his injuries received in the fall. It is also pleaded that, at the time of the injury to Meyer, he had an attack of vertigo, fits, or heart trouble, and that the injury and death of Meyer were due to an attack of vertigo, fits, heart trouble, or some bodily infirmity. When the case came on for trial, the defendant, in open court, expressly admitted all the allegations of the petition, except any liability to plaintiff, and denied liability because of the facts stated in the answer, showing that the death of Meyer was the result of an attack of vertigo, fits, heart trouble, or some bodily infirmity, and claimed and was awarded the opening and closing.

Three special interrogatories were submitted to the jury, to which they made answers as indicated. These interrogatories and answers were as follows: "*First.* Was the falling of H. H. Meyer on the brick pavement at Quincy, Ill., on October 22, 1892, at the time he was injured, caused directly or indirectly from fits, vertigo, or any disease or bodily infirmity? Answer: No. *Second.* If the falling of H. H. Meyer on the brick pavement was caused directly or indirectly by reason of any disorder in his physical condition at

that time, did such condition result from some temporary cause and not from previous disease or bodily infirmity? Answer: Yes. *Third.* If you answer the last interrogatory 'Yes,' was the disorder something other than fits or vertigo? Answer: Yes." The jury also returned a general verdict for the plaintiff.

The abstract contains several assignments of error, but the argument of appellant's counsel relates to but two subjects: *First,* it is insisted that the verdict is not sustained by sufficient evidence; and, *second,* that the court erred in its instructions to the jury. Some other matters are referred to, which we may incidentally mention during the course of the opinion.

As the defendant assumed the burden of showing that the injuries which caused the death of Meyer resulted directly or indirectly from an attack of vertigo, fits, heart trouble, or some bodily infirmity, it is manifest that the verdict is right, unless the evidence adduced to sustain this issue is so overwhelming as to produce the conviction that the verdict was the result of passion or prejudice, or unless, under the undisputed evidence in the case, no two minds of ordinary intelligence could reasonably and fairly come to any other rational conclusion than that the injury and death of Meyer were due to or caused by an attack, as claimed by the defendant. We have already recited enough of the facts to show that the assured was a man of good health, and free from disease, so far as could be discovered by members of his family or by his family physician, up until within a few minutes of the accident. It is true that when first observed, just prior to his fall, he was staggering or wavering, as one might do who had an attack of vertigo, or who was subject to fits; but the experts whose testimony was adduced upon trial say that his conduct might be due to a fainting spell, caused by some injury or shock to his system, or to an attack of indigestion,

or to a number of other causes. There is no more rea-
son for saying that the accident was due to an attack
of vertigo or fits than that it was caused by some slight
injury just previously received, or to some other local
cause, which resulted in a temporary faint, causing
the fall. It will not do to say that the evidence shows
beyond controversy that the injury and death were
due to an attack of vertigo, fits, heart trouble, or some
other bodily infirmity, unless we are prepared to hold
that any slight or temporary disorder is a "bodily
infirmity," within the meaning of the policy. And this
brings us to the second question in the case.

II.   The court instructed the jury, in substance,
that, if the death of Meyer was due to an attack of
vertigo or fits, then the plaintiff could not recover, nor
did it matter whether the attack was sudden, unex-
pected, or temporary, or the manifestation of a per-
manent disorder; but, with reference to "disease" and
"bodily infirmity," the court gave this instruc-
tion: "(6) If Herman H. Meyer's fall was caused
by disease, plaintiff cannot recover; but the
question naturally arises, what is a "disease' within
the meaning of the contract in suit? The ordinary
definition of the word is: 'Any derangement of the
functions or alteration of the structure of the animal
organs.' This, as you will see, would include the
slightest and most temporary ailment. But this is not
its meaning as used in this policy. The policy or con-
tract in suit singles out some particular diseases, as
vertigo or fits, and exempts the company from lia-
bility for accidents caused thereby; and in such cases,
as I have told you in the last instruction, the com-
pany will be relieved from liability, even if the attack
was sudden, unusual, and of a transient nature; but if
you don't find either of these two specially mentioned

maladies to have been the cause of the accident, but are required to see whether such cause existed under the general head of 'disease,' then you must accept this word as meaning some ailment or disorder of somewhat established or settled character, some physical disturbance to which Meyer was subject, and of which the attack that caused his fall was in some measure a recurrence. A mere temporary disorder, that was new or unusual with him, arising from some sudden and unexpected derangement of the system, though it produced or caused unconsciousness, would not be a 'disease' within the meaning of this contract, and would not exempt the defendant company from liability in this action. Here, again, you are limited to circumstantial evidence upon which you are to base your finding." In another instruction the court said: "Construing the contract or policies sued upon, I may say that under its provisions, if said Meyer's fall was caused by vertigo or fits, or by reason of disease or bodily infirmity, the defendant cannot be held liable in this action. And, under the facts in this case, the words 'disease' and 'bodily infirmity' must be considered as having the same meaning."

These instructions are vigorously assailed. It is contended on behalf of the company that it is exempt from liability on account of injury, through any defect, imperfection, weakness, or unhealthy state of the body, although the same was not a developed or recognized disease; and that, while the words "any disease" would embrace and include any "bodily infirmity," yet "every bodily infirmity" would not necessarily be a disease. The instruction with reference to an attack of vertigo or fits is not complained of, and the controlling point on this branch of the case turns upon the definition given by the court of the terms "disease" and "bodily infirmity." It is said the court erred in

holding them to mean, in effect, the same thing, and that in any event, the sixth paragraph of the charge is erroneous and misleading. As used in this policy, we think the words "disease" and "infirmity" mean practically the same thing. When speaking of an "infirmity," we generally mean the state or quality of being infirm physically or otherwise,—debility or weakness; and by the 'use of the word "disease" we desire to convey the impression of a morbid condition, resulting from some functional disturbance or failure of physical function which tends to undermine the constitution. We do not, as a general rule, apply either term to a slight and temporary disorder, or to the imperfect working of some function, which is over in a short period of time, and which, when recovered from, leaves the body in its normal condition. In using either of the words, we do not, as a rule, refer to a slight and mere temporary disturbance or enfeeblement. If this is true of our ordinary speaking and writing it is certainly clear that the words should be given no broader meaning when we find them used by an insurance company in a clause of its policy which it relies upon to defeat a recovery thereon. The language used is made up of words framed by the company or its legal advisers in an attempt to limit as narrowly as possible the scope of the insurance; and it is a universal, as well as a fair, rule, adopted by the courts everywhere, to construe the terms of the policy most strongly against the assurer, and to resolve every doubt or ambiguity in favor of the assured and against the assurer. The word "disease," when used in an ordinary life policy has been given the meaning we think should be applied to it in this case in the following, among other, cases: *Cushman v. Insurance Co.*, 70 N. Y. 72; *Insurance Co. v. Heimann*, 93 Ind. 24; *Insurance Co. v. McTague*, 49 N. J. Law, 587 (9 Atl. Rep. 766); *Pudritzky v. Supreme Lodge*, 76 Mich. 428 (43 N. W.

Rep. 373); *Brown v. Insurance Co.*, 65 Mich. 306 (32 N. W. Rep. 610); *Insurance Co. v. Daviess' Ex'r*, 87 Ky. 541 (9 S. W. Rep. 812). See also *Sieverts v. Association*, 95 Iowa, 710 (64 N. W. Rep. 671). The instruction given by the court below is in harmony with our views, and clearly makes the distinction which we think ought to be preserved between mere temporary disorders and those functional disturbances which are ordinarily denominated "diseases" or "bodily infirmities." Our position has strong support in the case of *Indemnity Co. v. Dorgan*, 7 C. C. A. 581 (58 Fed. Rep. 945), from the United States circuit court of appeals for the Sixth circuit; Taft, J., writing the opinion. This authority is clearly in point, and was evidently followed by the learned district judge in preparing his instructions in this case.

The phraseology of the sixth instruction is also complained of. It is said it required the defendants to prove that the attack was a recurrence of some previous attack, indicating a disorder, before it could be said to be disease. We do not so understand the instruction. The whole sentence a part of which is complained of reads: "Then you must accept this word as meaning some ailment or disorder of a somewhat established or settled character, some physical disturbance to which Meyer was subject, and of which the attack that caused his fall was in some manner a recurrence. A mere temporary disorder, that was new or unusual with him, arising from sudden and unexpected derangement of the system, though it produced or caused unconsciousness, would not be a 'disease,' within the meaning of this contract, and would not exempt the defendant company from liability in this action." The instruction is clear and unambiguous, and is not fairly susceptible of the construction counsel would place upon it. It is also said that the court was in error in instructing with reference to

disease, for the reason that defendant did not plead "disease," but "bodily infirmity." The policy, however, used both terms, and reliance was placed upon the provision. The court was required to so instruct in order to fully present the issues.

It is also said in argument that the policy covers death from violent, external, and accidental means, and that the proximate cause of death in this case was not the fall, but some disorder with which the deceased was afflicted. It is quite clear, both on principle and authority, that, if the disorder which caused the fall was temporary and unexpected, the injury was violent, external, and accidental, and the whole matter was properly left to the jury for them to determine whether the disorder was of a temporary character.

An exposition of what is proximate cause is not called for here. It is almost, if not quite, impossible to give a definition of the term "proximate cause" which shall at once be clear, accurate, and comprehensive. It is sufficient to say that the question here mooted has been decided adversely to appellant by a long line of respectable authorities, among which are the *Dorgan Case, supra*, and *Max v. Assurance Co.*, 4 Law T. (N. S.) 833; *Winspear v. Insurance Co.*, 6 Q. B. Div. 42 (24 Alb. L. J. 331); *Lawrence v. Insurance Co.*, 7 Q. B. Div. 216; *Trew v. Assurance Co.*, 6 Hurl. & N. 838; *Reynolds v. Insurance Co.*, 22 Law T. (N. S). 820; *Insurance Co. v. Crandal*, 120 U. S. 527 (7 Sup. Ct. Rep. 685). It seems to be a well-settled rule in insurance law to attribute an injury or loss to its proximate cause only; and, if this be true, the disorder, whatever it may have been, was but a condition, the fall being the sole and proximate cause of the injury. Lord Bacon's first maxim that "it were infinite for the law to judge the cause of causes, and their impulsions one of another; therefore it contenteth itself with the

immediate cause, and judgeth of acts by that, without looking to any farther degree,"—seems to apply to this character of cases.

The instructions of the court below were correct; the verdict has support in the evidence; and the judgment is *affirmed*.